Michael D. O'Brien, OSB 951056
Michael D. O'Brien & Associates, P.C.
12909 SW 68th Parkway, Suite 160
Portland, OR 97223
(v) 503-786-3800
mike@pdxlegal.com

    Attorney for Walter & Patricia Smith, Debtors.

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>Walter Henry Smith<br>Patricia Harling Smith<br><br>           Debtors. | Case No. 19-32896-tmb7<br><br>OBJECTION TO TRUSTEE'S NOTICE<br>OF INTENT TO SELL PROPERTY |

    Walter & Patricia Smith, by and through counsel, Michael D. O'Brien, hereby appear and object to the Trustee's Notice of Intent to Sell Property as indicated in Docket #24. "[w]hat is the harm in a disproportionate trustee or professional fee if nobody objects? The harm is the loss of public confidence in the integrity of the bankruptcy system if it comes to be regarded as managed primarily for the benefit of those who operate it."[1] The Smiths have no objection to these purchasers but object to a sale at this price absent further investigation and inquiry. In support of their Objection, Debtors rely on the Declaration of Walter & Patricia Smith attached.

### Is the Buyer a "good faith purchaser"?

    Although not defined in the Code, a "good faith purchaser" is usually deemed to be one who purchases assets from the estate "in good faith" and "for value." *See, e.g.* <u>In re Ewell</u>, 958 F. 2d 276 (9th Circuit, 1992). A lack of good faith is found to exist when there appears to be

---

[1] In re Scoggins, 517 B.R. 206, 221(Bankr. E.D. Cal. 2014)(citations omitted).

Page **1** of **5 – Debtors' Objection to Trustee Notice of Intent to Sell**

fraud or collusion between the purchaser and the other bidders or Trustee. To determine if a purchase is "for value" the Courts generally look to appraisals of the assets or other evidence as to value. In addition, if the assets are being sold at an auction that adequately tests the market then the Courts will generally find sufficient value has been paid to afford good faith purchaser status. *See* In re Abbots Dairies, 788 F.2d 143 (3rd Circuit, 1986) *cited by* In re Onouli-Kona Land Co., 846 F.2d 1170 (9th Cir. 1988). Although not obvious for the record, it appears that the Trustee's realtor listed the property on October 3rd and received an offer on October 10th – hardly an "adequate test of the market." In light of the following facts it is uncertain that the market was tested at all.

The purchaser in this case, Steven and Vickie Marshall, are neighbors of the Debtors. Prior to the filing of the bankruptcy case the Debtors considered selling their home and in June 2019 were told by a Realtor they should ask $400,000 and to expect an offer in the range of $385,000 to $390,000. The Smiths made their neighbors aware that they were considering selling their home. Mr. Marshall expressed interest and was told by the Smiths the price was a firm $385,000. Although Mr. Marshall made no offer, he did not seem adverse to the price the Smiths' were asking and, prior to this bankruptcy filing, he inspected the property with both a realtor and an architect, received answers to numerous questions he had about the property and suggested he would pay for a survey once he knew he could purchase the home. After this case was filed, the Smiths were contacted by Mr. Marshall with further questions about the home and they advised Mr. Marshall of the bankruptcy and that a Trustee may be involved.

At the 341(a) hearing conducted in this case, the Smiths' disclosed to the Trustee the source of their valuation opinion and that they had a neighbor (Mr. Marshall) interested in purchasing

the property. After the hearing, Mrs. Smith texted the Trustee's name and contact info to Mr. Marshall.

A few weeks later, when the Trustee's realtor, Jorge Hasburn, came to inspect the home Mr. Hasburn suggested he would list the property at $310,000 and that it would have to be a "short sale." Mrs. Smith were flabbergasted by this price and challenged Mr. Hasburn. The listing apparently went "live" on October 3rd and in the days following, Mrs. Smith was inundated with calls from realtors and prospective buyers. On October 10th, only a week after the home was listed for sale, Mrs. Smith learned that the listing indicated a "Sale Pending" of her home.

The Notice of Intent is silent as to whether the prospective buyers have their own realtor. If they do not then is Mr. Hasburn acting independently for the benefit of the Estate? Should he be entitled to a full 6% commission when he sells property to a buyer hand delivered by the Debtors? The Notice does not include a copy of the offer and presents no evidence regarding the Trustee's efforts to test the market to ensure it is sold for the highest possible price.

### What is the true financial impact of the sale?

The court should examine the actual financial impact of the proposed sale and ask – who benefits? The answer appears to be:

A) The buyers who purchase a home at a price that appears to be below market value,

B) The Trustee's realtor who appears to earn a commission with very little effort selling property to a purchaser identified by the Smiths prior to their case filing,

C) The Trustee who stands to earn a commission on the sale. The Notice indicates a carve out to the Trustee of $10,000.

The court should also question who does NOT benefit from the proposed sale. That list appears to include:

A) The secured mortgage holder who is not paid in full. Granted the mortgage holder consented to a short sale, but was that based on a below market offer to purchase the property? Notice that the "Approval for Short Sale Payoff" letter from the secured creditor is dated December 9, 2019.

B) Unsecured creditors. It is unclear whether the Trustee will be seeking a commission based on the payment to the secured creditor. If he does, then such commission will exceed the $10,000 to which the Estate is entitled under this deal and the unsecured creditors will receive $0.00

C) The Debtors certainly do not benefit. This is not a situation where a foreclosure is imminent and the property will be lost any day. With this sale the Debtors possessory right will terminate. The Debtors are not receiving any compensation for being forced to vacate sooner than they otherwise would have.

Without more information it is impossible to verify that the proposed sale by the Trustee is being made in good faith and for value. Absent such evidence this court should not sanction the sale. Although deference is given to the business judgment of the Trustee, the U.S. Trustee handbook for Chapter 7 Panel trustees provides that "A Trustee shall not administer an estate or an asset in an estate where the proceeds of liquidation will primarily benefit the trustee or the professionals, or unduly delay the resolution of the case." U.S. Trustee Handbook, ch. 7 at 4-1. If the court approves the sale, the court has authority under 11 USC §§328(c) and 330(a)(2) to limit the compensation paid to the Trustee and the realtor.

Dated December 27, 2019          Respectfully submitted,

                                                   /s/ Michael D. O'Brien
                                                   Michael D. O'Brien, OSB 951056
                                                   Of Attorneys for Debtor

# CERTIFICATE OF SERVICE

## In Re: Walter & Patricia Smith

## Case: 19-32896-tmb7

I hereby certify that on December 27, 2019, I served the "**Debtors' Objection to Trustee Notice of Intent to Sell**" on the following parties by regular mail in a sealed envelope, with postage prepaid, and deposited in the United States Post Office:

Walt & Patricia Smith – via electronic mail

I further certify that the following person(s) will be served electronically via ECF when the foregoing document is filed with the court, in addition to any entity that has requested special notice from the Court:

Rodolfo Camacho, Trustee

US Trustee, Portland

Dated: December 27, 2019

                                                             /s/ Lauren Gary
                                                           Lauren Gary, Paralegal for
                                                           Michael D. O'Brien & Associates, P.C.

SALE OF HOME – 21920 SW RIBERA LANE   WEST LINN, OR  97068

| | |
|---|---|
| 6/16 | We had called a realtor friend to list house. She came, inspected house and yard, gave us listing price of $400K, with expected bid of $385K - $390K. We decided we couldn't afford her and to sell it on our own. |
| 6/21-6/22 | Garage sale for our whole street. First time we told some neighbors we were selling. |
| 7/4 | Ran into our neighbor, Steve Marshall (SM), in front of our house. He said he heard we were selling and he might be interested, would it bother us if he came over sometime to walk the property. I told him we were leaving in a couple days and would be gone for two weeks, he could look all he wanted. I told him we were asking $385K and it was non-negotiable. |
| 7/6-7/21 | In Henderson, NV |

We didn't hear from SM when we first came back, and I thought he probably wasn't interested. But over the following weeks he came to the house with a realtor friend and inspected the house and property, and he also came through the house with an architect friend who had built his house up the street. He texted me with various questions about the house: the septic tank, the pump, the well, the house in the back, all the things that would concern a buyer. He mentioned the possibility of having a survey done, would that be a problem for us? We had no objections.

| | |
|---|---|
| 8/6 | Filed for bankruptcy at Michael D. O'Brien's office. This is when we learned we would be assigned a Trustee, and he would have control of our house for 60+ days. I know I heard it, but I didn't comprehend the extent of it. |

Sometime in the following weeks SM called me about the location of our well. I invited him over to show him where it is as its location is not evident. While we were talking he mentioned he felt it was time to have the survey done. He said it would be costly so he didn't want to proceed without a legal contract assuring him that once it was done he would definitely be able to buy the house. Since Walt and I had been told we couldn't do anything legal with the house, I explained the bankruptcy. He wanted to proceed with the survey anyway so he spoke to his lawyer, and his lawyer told him he needed to be speaking with the Trustee, not us. That was the last time I spoke to SM for months.

| | |
|---|---|
| 9/11 | Bankruptcy court date. The Trustee was Rodolfo A. Camacho. Concerning the house, he asked where I got the stated value of the house. I told him a realtor had told us $400K as the suggested asking price, and we could expect a bid of $385K - $390K. I also told him we did not have a realtor, but we were selling it ourselves, and we had a neighbor that was very interested in the house at that price. He said he had a realtor that could usually pull a rabbit out of the hat. He said the realtor, Jorge Hasbun, would be calling us shortly and would be coming to inspect the house and property. |

Following our court appearance I texted Steve Marshall with the name and contact information of the Trustee.

I expected to hear from the realtor right away but I did not. I googled his name to get his information, thinking maybe I should call him. I called the Trustee's office to say I hadn't heard from him, but they assured me I would.

When Mr. Hasbun came to see the house, I was rather put off that he seemed to be barely looking at it. It took him only a few minutes to look at the whole house and property. He didn't ask any questions, he seemed more interested in the file in his hands than the actual property. When he was finished he said he would recommend a short sale. I was shocked. I told him a realtor had already told me the asking price of $400K. I asked him why on earth it would be a short sale when I already had a buyer that was interested at $385K? He picked up on that and said, "So you're moving? When are you leaving?" I told him my husband had been very sick and I didn't know when we could leave. He said the property needed a lot of work. I repeated that my husband had been ill for the past year, but it just needed to be maintained and brought up to date. He repeated that he would recommend a short sale. I wasn't going to argue with him, but it seemed so ridiculous that I didn't believe anyone would accept his recommendation, so I wasn't terribly concerned. I did contact my lawyer, Michael O' Brien, the next day and relay all that had happened so he would have it on record.

Case 19-32896-tmb7    Doc 26    Filed 12/27/19

A week into October - The house was put on the market. Walt wasn't well, and I didn't want to be getting him out of bed and packing him off all the time, but realtors were calling and arguing with me! They demanded to see the house NOW. When I explained the situation, they offered to double up, coming at the same time as other realtors, as long as they could get their buyer in right away. It was like a blow-out sale! My realtor friend called and told me it was listed at $310,000, that she almost fell off her chair when she saw it, and no wonder it was a feeding frenzy, they were giving it away. But after just a couple days everyone stopped calling. I knew it had sold.

10/10   My realtor friend called again to say there was a sale pending. She sent me about ten comps, none of which could even begin to compare with my beautiful property, and they were all in the high $300K range.

After that, I waited to hear something, anything, but nothing. I called Michael O'Brien's office to see if they knew what was happening with the house, and I made an appointment for a phone conference with him.

10/28   Phone conference with Mr. O'Brien. He explained that everything the Trustee did had to be approved by the courts. Mr. Camacho had applied to the court for approval to hire a realtor, but he had never applied for approval to sell the house, and when he did Mr. O'Brien would be notified electronically. I don't know what happened there, but I never heard that had taken place.

10/31   I received a call from the realtor, Mr. Hasbun, telling me the bank had requested an appraisal and it was scheduled for November 7th. When I asked what bank, I was surprised to learn it was Ocwen Bank. They had held our original mortgage before it was sold to PHH Mortgage Services.

11/7   The appraisal was set for 10:30. When I saw a truck in our drive a little beforehand, I went out to say hello and ask him inside, but it wasn't the appraiser, it was Mr. Hasbun, the realtor, which surprised me. He had been asked to be there because we don't have a lockbox, but I had assured him we would be there to let him in. The appraiser, Rod Hess, came right away and I took him in the house. Mr. Hasbun remained outside, but when the appraiser went out to walk the property, Mr. Hasbun went with him.

11/9   Took Walt to ER. He was admitted and was essentially in the hospital until 12/5, and even then was on heavy-duty drugs and had an upcoming surgery scheduled for 11/16. I was at the hospital all day, everyday, and admittedly was oblivious and uninformed as to what was happening with the house.

12/13   The realtor, Mr. Hasbun, called to tell me the house had sold to SM. I hadn't been focused on the house, but was still surprised it could have sold without me knowing anything at all. He said the closing date would be 1/23, and it would be up to the buyer whether or not we had to be out by then.

Walt still had two surgeries coming up, so I wanted to appeal to SM. I texted him and told him I had just heard, told him we were happy for him, and let him know I was concerned about moving due to Walt's health. He texted back that he was proceeding with the survey and would let me know when it was scheduled. He also said they would try to be understanding of Walt's health, and did I have an idea of how much time we might need?

I then called Michael O'Brien's office in response to their request that I set up a conference call with Mr. O'Brien, and the call was set for 12/23, the following Monday.

12/16   I got a text from SM wanting to talk, but I was at the hospital waiting for Walt to get out of surgery, and I told him any other time would be better.

12/17   I texted SM, told him the surgery went well, and that I could talk when he was ready. We spoke later that afternoon, and he told me that my lawyer had blocked the sale of the house, and he wanted to know what was going on. I told him I hadn't spoken to Mr. O'Brien in many weeks, but I had a phone conference scheduled the following Monday. SM didn't want to wait that long, so I called Mr. O'Brien's office back, and due to a cancellation I was able to move my phone conference up to Thursday, the 19th.

12/19  I spoke to Mr. O'Brien at length regarding the sale of the house. We both believed the house had been sold significantly below it's true value.

12/20  Walt to OHSU for surgery, so did not attempt to speak with anyone.

12/21  SM texted me to ask if I had spoken to my lawyer, and I texted him back, backtracking over how much I had objected to the short sale from the beginning, and everything that had transpired from my perspective, as documented in this paper. I suggested, at Mr. O'Brien's urging, for SM to have his lawyer contact Mr. O'Brien, and I furnished the contact information.

12/22  SM texted, enumerating the reasons he believed the short sale should proceed. He didn't mention his lawyer, but stated he was going to ask the Trustee to call Michael O'Brien on Monday.

I have since learned that the mortgage lender's (PHH Mortgage Services) suggested listing price was $412,000.

_____  12-22-19        _____  12.22.19
Patricia Harling Smith         Date              Walter Henry Smith          Date